**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| Mónica E. González-López, et al<br><br>**Plaintiffs,**<br><br>**v.**<br><br>Municipality of San Juan, et al<br><br>**Defendants.** | **CIVIL NO. 23-1278 (RAM)** |

**OPINION & ORDER**

Pending before the Court are four Motions for Summary Judgment: (1) Codefendant Police Officer Emmanuel Ramos-Pabón ("PO Ramos-Pabón")'s *Motion for Summary Judgment* (Docket No. 209); (2) Codefendant Police Officer Alberto Robles-Concepción ("PO Robles-Concepción")'s *Motion for Summary Judgment* (Docket No. 224); (3) Codefendants Municipality of San Juan, Mr. Miguel A. Romero-Lugo and Mr. Juan J. García (collectively, the "Municipality")'s *Motion for Summary Judgment* (Docket No. 226); and (4) Plaintiffs Ms. Mónica González and Mr. José Rodríguez (collectively, "Plaintiffs")'s *Motion for Summary Judgment* (Docket No. 214).

For the reasons set forth below, the Court **GRANTS** PO Ramos-Pabón, PO Robles-Concepción and the Municipality's *Motions* and **DENIES** Plaintiffs' *Motion*.

## I. PROCEDURAL BACKGROUND

The suit arises from the untimely death of Plaintiffs' son, Mr. Christian José Rodríguez-González ("Mr. Rodríguez-González" or the "decedent"), who was shot and killed during a police chase carried out by PO Robles-Concepción and PO Ramos-Pabón on July 15, 2022. (Docket No. 52 ¶ 15). Plaintiffs filed suit on May 30, 2023, and then filed an *Amended Complaint* on September 18, 2024. (Docket Nos. 1 and 52).

On November 24, 2025, Plaintiffs and Defendants moved for summary judgment in four separate filings. (Docket Nos. 209, 214, 224, and 226). In their *Motions*, PO Robles-Concepción and PO Ramos-Pabón (collectively, the "Officers") argued the uncontroverted evidence supported summary judgment in their favor. (Docket Nos. 209 and 224). The Officer's arguments included that: (1) they are entitled to qualified immunity for their involvement in the intervention with and death of Mr. Rodríguez-González on July 15, 2022; and (2) they should prevail on the merits of the case regardless of immunity because their use of force was reasonable and that, if a right to provide care exists, they provided it. Id. On their part, the Municipality argued that, because the Officers did not commit a constitutional violation, there can be no basis for finding supervisory liability against the Municipality. (Docket No. 226 at 3). The Municipality also argued that they did not personally violate any constitutional rights of the decedent

and could, therefore, not be found liable regardless of the liability of the Officers. Id. at 4.

In their *Motion*, Plaintiffs conversely averred the uncontroverted evidence supported summary judgment in their favor. (Docket No. 214). Plaintiffs' arguments included that: (1) there is uncontroverted evidence that PO Robles-Concepción used excessive use of force when he shot Mr. Rodríguez-González in the back; (2) PO Ramos-Pabón failed to stop the shooting; and (3) the Officers failed to comply with their duty to transport the decedent to the hospital in the patrol car if the ambulance was taking too long to arrive. Id.

## II. LEGAL STANDARD

Summary judgment is proper under Fed. R. Civ. P. 56(a) "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" White v. Hewlett Packard Enterprise Company, 985 F.3d 61, 68 (1st Cir. 2021) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322)). A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Alicea v. Wilkie, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion

for summary judgment." Bautista Cayman Asset Co. v. Terra II MC & P, Inc., 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The movant bears the burden of showing a lack of genuine issues of material fact. *See* Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (citing Celotex Corp., 477 U.S. at 323). This burden is met when the movant shows that the nonmovant "has failed 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" E.E.O.C. v. Kohl's Dept. Stores, Inc., 774 F.3d 127, 131 (1st Cir. 2014) (quoting Celotex Corp., 477 U.S. at 322).

The non-movant may defeat summary judgment by evincing, "through submissions of evidentiary quality, that a trialworthy issue persists." Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020) (quotation omitted). It "cannot merely 'rely on an absence of competent evidence but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.'" Vogel v. Universal Insurance Company, 2021 WL 1125015, at *2 (D.P.R. 2021) (quoting Feliciano-Muñoz, 2020 WL 4592144, at *6). Conclusory allegations and unsupported speculation do not defeat summary judgment. *See* River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 41 (1st Cir. 2019) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a non-movant must "admit, deny or qualify the

facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." L. CV. R. 56(c). Adequately supported facts shall be deemed admitted unless controverted per the manner set forth in Local Rule 56. *See* Muñiz Negrón v. Worthington Cylinder Corporation, 2021 WL 1199014, at *3 (D.P.R. 2021) (quotation omitted). Litigants ignore this Rule at their peril. Id.

## III. FINDINGS OF FACT

To make findings of fact, the Court analyzed Defendants' three *Statements of Uncontested Material Facts in Support of Motion for Summary Judgment* ("DSUF") (Docket Nos. 209-1, 220, and 228) as well as Plaintiffs' three *Denials, Qualifications, and Admissions* ("Responses") thereto. (Docket Nos. 256-1, 257-1, and 255-1). The Court also analyzed Plaintiffs' *Statement of Uncontested Material Facts* ("PSUF") (Docket No. 215) and Defendants' respective *Responses* thereto (Docket Nos. 251, 268, and 275).

After only crediting material facts that are properly supported by a record citation and uncontroverted, the Court makes the following findings of fact:

1. On July 15, 2022, PO Robles-Concepción and PO Ramos-Pabón were assigned to the municipal police headquarters in Antillas. (Docket No. 220-1 at 29).

2. On that day, the Officers were patrolling the streets of San Juan on patrol car number P-001 (the "patrol car"). Id. at 29-30; (Docket No. 220-9 at 38).
3. The Officers were inside the patrol car which was stopped at a red light in the 65th Infantry Avenue and Street No. 49 intersection of Parcelas Falú. (Docket Nos. 220-1 at 30; 220-9 at 57).
4. While at the intersection, the Officers spotted two motorcycles that ran through the red light. Id.
5. One of the motorcycles was a grey, black and red Honda CRF 250 R from 2007 (the "motorcycle"). (Docket Nos. 220-4 at 61; 220-11 at 28).
6. Mr. Rodríguez-González was driving the motorcycle fast and in a reckless manner. (Docket No. 220-1 at 31).
7. Mr. Rodríguez-González was carrying a backpack with what the Officers believed to be a long, black rifle barrel protruding from the top. (Docket Nos. 220-1 at 30; 220-9 at 57).
8. Mr. Rodríguez-González was wearing a face mask that covered his face and neck almost completely. (Docket Nos. 220-1 at 30; 220-9 at 66; 220-14 at 3).
9. The only visible part of the decedent's face were his eyes. Id.
10. The motorcycle did not have a license plate. (Docket Nos. 220-1 at 30; 220-9 at 67).

11. A valid license plate is required for a motor vehicle to transit through the streets of Puerto Rico. *Puerto Rico Vehicle and Traffic Act*, P.R. Laws. Ann. Tit. 9 §§5001(75), 5001(96) and 5021.
12. Mr. Rodríguez-González was not wearing a safety helmet or protective gear. (Docket Nos. 220-1 at 30; 220-9 at 67).
13. The Officers ordered the two motorcycles to stop. (Docket No. 220-1 at 31).
14. Both motorcycles failed to yield and instead fled from the Officers. (Docket No. 220-4 at 36).
15. Mr. Edwin Colbourne ("Mr. Colbourne"), the driver of the second motorcycle, testified that, when he and Mr. Rodríguez-González saw the Officers, they accelerated the motorcycles and attempted to escape from the police. Id.
16. Mr. Colbourne testified he was worried because Mr. Rodríguez-González's rifle looked real. (Docket No. 220 at 5).
17. After beginning the chase, PO Robles-Concepción informed the Command Center of what was happening and provided a description of the individuals driving the motorcycles. (Docket No. 220-1 at 31).
18. During the pursuit, the two motorcycles separated and continued in different directions. (Docket No. 220-4 at 36-37).

19. The Officers continued pursuit of Mr. Rodríguez-González who ignored their orders to stop. (Docket No. 220-1 at 31-32).
20. At one point during the chase, the Officers lost sight of Mr. Rodríguez-González. Id.
21. When the Officers saw Mr. Rodríguez-González again, the rifle that was originally in his backpack had been repositioned and moved to the front of the motorcycle, between the decedent's legs. Id.; (Docket No. 220-9 at 58-59).
22. Pictures captured from the security cameras of a nearby business show Mr. Rodríguez-González riding the motorcycle with the rifle between his thighs and the motorcycle fuel tank. (Docket No. 220-17 at 13-21).
23. After noticing that Mr. Rodríguez-González had moved the rifle to the front of the motorcycle, PO Robles-Concepción took his regulation weapon out of the patrol car window and aimed it at the motorcycle. (Docket No. 220-1 at 32-33).
24. Mr. Rodríguez-González then grabbed a hold of the rifle with his right hand. (Docket Nos. 220-1 at 31-33; 220-9 at 59-62).
25. PO Robles-Concepción testified that, at that time, he feared for his life and his partner's life. (Docket No. 220-1 at 32-33).
26. PO Robles-Concepción yelled at Mr. Rodríguez-González to put the gun down. (Docket No. 220-9 at 60).

27. While holding the rifle with his right hand, Mr. Rodríguez-González began to make a movement with his body to the right. (Docket Nos. 220-1 at 31-33; 220-9 at 59-62).

28. When the Officers saw Mr. Rodríguez-González turning to the right, PO Robles-Concepción fired one shot. Id.

29. The bullet PO Robles-Concepción fired hit Mr. Rodríguez-González in the left side of his back and the decedent fell to the ground. (Docket Nos. 220-11 at 22; 220-1 at 33).

30. After Mr. Rodríguez-González fell to the ground, the Officers stopped the patrol car and got out of the car. (Docket No. 220-1 at 33).

31. The Officers called the Command Center on the radio to ask for an ambulance. (Docket Nos. 220-9 at 49; 220-1 at 33).

32. The Officers made various follow up calls to the Command Center to ask the location of the ambulance. (Docket No. 220-9 at 86-87).

33. PO Ramos-Pabón requested paper towels and gloves from a neighbor, and he used those materials to provide Mr. Rodríguez-González with first aid, namely putting pressure on the wound until the ambulance arrived. (Docket No. 220-9 at 86-87).

## IV. DISCUSSION

### A. Excessive Force

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A police officer's use of deadly force is deemed a seizure under the Fourth Amendment, and such an extreme action is reasonable (and, therefore, constitutional) only when 'at a minimum, a suspect poses an immediate threat to police officers or civilians.'" McKenney v. Mangino, 873 F.3d 75, 81 (1st Cir. 2017) (citing Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003)). A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's reasonableness standard. Plumhoff v. Rickard, 572 U.S. 765, 774 (2014). Reasonableness is assessed "from the perspective of a reasonable officer on the scene," it requires analyzing the totality of the circumstances and it cannot benefit from the 20/20 vision of hindsight. Bannon v. Godin, 99 F.4th 63 (1st Cir. 2024), cert. denied, 145 S. Ct. 1048 (2025), reh'g denied, 145 S. Ct. 1347 (2025). In the totality of the circumstances analysis, courts consider: (1) whether a reasonable officer on the scene could believe that the suspect posed an immediate threat to police officers or civilians; (2) whether a warning was given before the use of force and whether the suspect complied with this command; (3) whether the suspect

was armed at the time of the encounter or whether the officers believed the suspect to be armed; (4) the speed with which officers had to respond to unfolding events, both in terms of the overall confrontation and the decision to employ force; (5) whether the suspect was advancing on the officers or otherwise escalating the situation; (6) the suspect's physical proximity to the officers at the time of the use of force; (7) whether multiple officers simultaneously reached the conclusion that a use of force was required; and (8) the nature of the underlying crime. *See* id. (collecting cases).

Notably, the Supreme Court recently rejected the "moment-of-threat rule" whereby courts look "only to the circumstances existing at the precise time an officer perceived the threat inducing him to shoot" because said approach "improperly narrow[s] the requisite Fourth Amendment analysis." Barnes v. Felix, 605 U.S. 73, 76 (2025). In Barnes, the Supreme Court reasoned that:

> [T]he "totality of the circumstances" inquiry into a use of force has no time limit. Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones.

Id. at 80.

While Plaintiffs contend the Officers' actions were unreasonable under the Fourth Amendment because the decedent was

fleeing from the Officers when PO Robles-Concepción shot him in the back, they have not provided evidence that controverts the Officers' version of the events. (Docket No. 214 at 1). Plaintiffs provide an unsworn expert report to support their argument that the decedent did not make a threatening movement with his gun. (Docket No. 216-14). However, an unsworn expert report is inadmissible testimonial evidence that cannot be considered at the summary judgment stage. *See* Rios Colon v. United States, 928 F. Supp. 2d 388, 391 (D.P.R. 2012) (unsworn expert report is, at best, an inadmissible hearsay document of the purported expert's opinion); Pack v. Damon Corp., 434 F.3d 810, 815 (6th Cir.2006) (expert report was "unsworn and thus is hearsay, which may not be considered on a motion for summary judgment"). "While a court may take into account any material that would be admissible or usable at trial, inadmissible evidence may not be considered [at the summary judgment stage." Ramirez-Ortiz v. Corporacion Del Centro Cardiovascular de Puerto Rico y Del Caribe, 32 F. Supp. 3d 83, 88 (D.P.R. 2014) (citing Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.1993) (cleaned up)). Moreover, the Court sees "nothing inherently unbelievable about [the] officer[s'] testimony." LaFrenier v. Kinirey, 550 F.3d 166, 167-68 (1st Cir. 2008) (holding that, where two defendant police officers' testimony was consistent as to key point, that testimony could support summary judgment despite fact officers were not "disinterested" in result).

Therefore, the Court only considers the admissible evidence before it. Here, most of the eight factors laid out in Bannon weigh in favor of the Officers use of force. The evidence shows the Officers: (1) believed that Mr. Rodríguez-González was armed with a long, black assault rifle and they feared their lives were in danger; (2) ordered Mr. Rodríguez-González to drop the gun and stop the motorcycle multiple times; (3) were involved in a rapidly evolving situation during a high speed pursuit; and (4) were confronted with threatening movements from the decedent who they believed was armed. (Docket No. 220-1 at 30-33); (Docket No. 220-9 at 40, 57-62).

The Court must consider "the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Bannon, 99 F. 4th at 78 (citing Graham v. Connor, 490 U.S. 386, 387(1989)). The record makes clear that any reasonable officer would have concluded that Mr. Rodríguez-González posed an immediate threat both to the officers and to the public at the time of the fatal split-second decision by PO Robles-Concepción to shoot the decedent. The Officers witnessed the decedent driving fast and in a reckless manner openly carrying what they believed was a long, black assault rifle. Moreover, the Officers saw the decedent, who had ignored their orders to stop and drop the weapon, hold the

weapon in his right hand and make a threatening gesture toward the patrol car. Therefore, the Officers had probable cause to make an arrest, and they had reason to consider the decedent dangerous.

With the benefit of hindsight, it is certainly tragic that Mr. Rodríguez-González was making threatening movements with a pellet gun. However, it was Mr. Rodríguez-González's own decision to flee from police officers and threaten them which served as the catalyst for the chain of events that resulted in his death. From the Officers perspective on that fateful day, Mr. Rodríguez-González represented a danger and a significant threat to the safety of the agents and the public as he fled at high speed with what the Officers believed to be a dangerous assault rifle in his hand. The use of deadly force to apprehend the decedent was certainly reasonable. Because the use of force in this case was reasonable, Plaintiffs' argument that PO Ramos-Pabón failed to intervene and stop the fatal shooting is meritless. Accordingly, the Officers did not violate the decedents Fourth Amendment rights in the force they used to intervene with him.

**B. Duty to Provide Care**

Fourteenth Amendment substantive due process requires the government to provide medical care to persons who are injured while being apprehended by the police. Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016) (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983)). "The boundaries of this

duty have not been plotted exactly; however, it is clear that they extend at least as far as the protection that the Eighth Amendment gives to a convicted prisoner." Id. (citing Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990)). Government officials violate the Eighth Amendment if they display "deliberate indifference" to a prisoner's "serious medical needs." Id. A "serious medical need" "is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. Deliberate indifference requires (1) that "the official ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) that they draw that inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A fact finder can conclude that a government official was aware of a substantial risk of serious harm based on the fact that the risk was obvious. Id. at 842. However, there is no deliberate indifference if an official responds reasonably to the risk, even if the harm ultimately was not averted. Id. at 844-45; *see also* Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir.2011) (deliberate indifference can consist of "a conscious failure to provide medical services where they would be reasonably appropriate").

Here, Plaintiffs claim the Officers were negligent in their duty to provide medical care because they: (1) called the ambulance

three minutes after Mr. Rodríguez-González was shot; (2) did not immediately provide their whereabouts which delayed the arrival of the ambulance; (3) put pressure on the wound which was not an effective way to stop internal bleeding; and (4) failed to transfer the decedent to the hospital in their patrol car. (Docket No. 214 and 215). The Court disagrees.

From the moment Mr. Rodríguez-González fell to the ground and the Officers realized he was bleeding, the Officers called an ambulance and began providing first aid to the decedent at the scene with limited supplies provided by a neighbor. (Docket No. 220-9 at 49); (Docket No. 220-1 at 33). The Officers also made various follow up calls to the Command Center inquiring about the status of the ambulance. (Docket No. 220-9 at 86-87).

Substantive due process requires only that an official responds reasonably to the risk of serious harm. Plaintiffs have not shown the Officers were required to transport the decedent to the hospital in their patrol car, despite the fact that they seemingly were allowed to, nor that it was required the Officers provide care beyond the reasonable measures they took—to attempt to stop the bleeding and call an ambulance to come to the decedent's aid. No more can be expected from law enforcement officers as they are not doctors. Costoso v. United States, 884 F. Supp. 52 (D.P.R. 1995). Therefore, the Officers did not violate

the decedents Fourteenth Amendment substantive due process rights in the medical attention they provided.

**C. Qualified Immunity**

Qualified immunity protects officers from suit unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." Fagre v. Parks, 985 F.3d 16, 24 (1st Cir. 2021) (internal quotation marks omitted) (quoting Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020)); *see also* Philip v. Cronin, 537 F.3d 26, 34 (1st Cir. 2008) (reasoning that, even if a constitutional right has been clearly established, a defendant may nonetheless be protected by qualified immunity if a reasonable official in the defendant's position could have believed (even wrongly) that the at-issue conduct was not violative of a constitutional right)). "This is a 'heavy burden' for a plaintiff to meet." Bannon, 99 F. 4th at 84 (citing Johnson v. City of Biddeford, 92 F.4th 367, 375-76 (1st Cir. 2024)). The qualified immunity the officers enjoy is intended to protect all but the plainly incompetent or those who knowingly violate the law. Id. (cleaned up) (citing Jakuttis v. Town of Dracut, 95 F.4th 22, 30 (1st Cir. 2024)).

In the Fourth Amendment context, the "[s]pecificity" of the rule set forth in such precedent "is especially important," because it can be "difficult for an officer to determine how the relevant legal doctrine," such as excessive force, "will apply to the

factual situation the officer confronts." Lachance v. Town of Charlton, 990 F.3d 14, 21 (1st Cir. 2021) (alteration in original) (quoting City of Escondido v. Emmons, 586 U.S. 38, 42 (2019)). Thus, outside of obvious cases, "'relevant case law,' where 'an officer acting under similar circumstances ... was held to have violated the Fourth Amendment,' is 'usually necessary' to overcome officers' qualified immunity." Id. (omission in original) (quoting District of Columbia v. Wesby, 583 U.S. 48, 64 (2018)). The plaintiff bears the burden of "identify[ing] controlling authority or a consensus of persuasive authority sufficient to put the officers on notice that their conduct violated the law." Est. of Rahim by Rahim v. Doe, 51 F.4th 402, 412 (1st Cir. 2022).

Moreover, courts are mindful "that deciding qualified immunity at the summary-judgment stage can be tricky." Justiniano v. Walker, 986 F.3d 11, 27 (1st Cir. 2021). However, "qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" meaning "'it is effectively lost if a case is erroneously permitted to go to trial.'" Id. (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). As such, qualified immunity's applicability "should be resolved at the earliest possible stage of litigation." Id. (citing Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013)). Nonetheless, "[t]he doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped," and "[p]lotting

that intersection can present thorny analytic problems." Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009) (summary judgment "requires absolute deference to the nonmovant's factual assertions," while qualified immunity "demands deference to the reasonable, if mistaken, actions of the movant.").

Here, to quash the Officer's qualified-immunity defense, Plaintiffs needed to "show (1) that [the Officers] infracted [the decedent's] federal rights and (2) that these rights were so clearly established that a reasonable officer should have known how they applied to the situation at hand." Justiniano v. Walker, 986 F.3d 11, 26 (1st Cir. 2021) (citing Belsito Commc'ns, Inc. v. Decker, 845 F.3d 13, 23 (1st Cir. 2016)). Put another way, the qualified immunity analysis hinges upon: (i) whether the plaintiff has asserted a cognizable violation of a constitutional right; (ii) whether that right was clearly established at the relevant time; and (iii) whether a reasonable public official in the defendant's position should have understood that his actions infringed that right. Id.

Plaintiffs' arguments fail at the first branch. As the Court has established, the Officers did not violate the decedents Fourth or Fourteenth Amendment rights. Moreover, Plaintiffs have failed to identify precedent finding a Fourth or Fourteenth Amendment violation under similar circumstances. *See* City of Tahlequah v. Bond, 595 U.S. 9, 14 (2021). The Court also finds that "objectively

reasonable officers ... would not have understood the[se] actions to violate the law." Rahim, 51 F.4th at 413. As such, the Officers are entitled to qualified immunity.

**D. Municipal Liability**

"[A] municipality 'may be liable under [§ 1983] if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.'" Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011) (internal quotation marks omitted) (quoting Connick v. Thompson, 563 U.S. 51, 60 (2011)). Municipalities "are responsible only for their own unconstitutional acts," and "are not vicariously liable ... for the actions of their non-policymaking employees," and so "a plaintiff must 'identify a municipal policy or custom that caused the plaintiff's injury.'" Id. (internal quotation marks omitted) (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997)).

A municipality's "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but only where the "failure to train its employees in a relevant respect ... amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" Bannon, 99 F. 4th at 88 (citing Connick, 563 U.S. at 61 (last alteration in original)).

This theory of municipal liability is viable only where a plaintiff establishes the existence of "underlying, identifiable constitutional violations ...." Lachance, 990 F.3d at 31 (omission in original) (quoting Kennedy v. Town of Billerica, 617 F.3d 520, 531 (1st Cir. 2010)). Given that the Court has already found that the shooting did not violate the Fourth Amendment and the medical care provided did not violate the Fourteenth Amendment, neither can support the claim against the Municipality. Therefore, the Municipality cannot be held liable in this matter.

**V. SUPPLEMENTAL JURISDICTION**

First Circuit case law is clear "that district courts may decline to exercise supplemental jurisdiction over pendent state law claims when the anchor federal claims for those state law claims are dismissed." Borrás-Borrero v. Corporación del Fondo del Seguro del Estado, 958 F.3d 26, 37 (1st Cir. 2020); *see also* 28 U.S.C. § 1367(c). Where, as here, the federal claims are dismissed, a District Court is well within its discretion to decline to exercise supplemental jurisdiction over pending state-law claims. *See e.g.*, Massó-Torrellas v. Mun. of Toa Alta, 845 F.3d 461, 469-70 (1st Cir. 2017); *see also*, Rivera-Diaz v. Humana Ins. of Puerto Rico, Inc., 748 F.3d 387, 392 (1st Cir. 2014) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, (1988)) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors [...] will point toward declining to

exercise jurisdiction over the remaining state-law claims.”). Therefore, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c). All Plaintiffs’ supplemental claims under Puerto Rico law are hereby **DISMISSED WITHOUT PREJUDICE.**

## VI. CONCLUSION

The Court finds that there are no genuine issues of material fact warranting a jury trial. Therefore, the Court **GRANTS** Codefendants Police Officer Emmanuel Ramos-Pabón, Police Officer Alberto Robles-Concepción, Municipality of San Juan, Mr. Miguel A. Romero-Lugo and Mr. Juan J. García’s *Motions for Summary Judgment* at Docket Nos. 209, 224 and 226. The Court **DENIES** Plaintiffs Ms. Mónica González and Mr. José Rodríguez’s *Motion for Summary Judgment* at Docket No. 214. Plaintiffs’ claims under federal law are **DISMISSED WITH PREJUDICE.** All Plaintiffs’ supplemental claims under Puerto Rico law are hereby **DISMISSED WITHOUT PREJUDICE.** Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 14th day of September 2026.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge